# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| LOGICALIS, INC., | : | |
| | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. |
| CENTERGRID, LLC, BOB CHAPP, | : | |
| SARAH HARRISON, DAVID | : | |
| TOWNSEND, REBECCA | : | **JURY TRIAL DEMANDED** |
| MIRACLE, RYAN FELD, NICO | : | |
| BAUMGART, BOBBY | : | |
| HAMILTON, ALISHA JOHNSON, | : | |
| RON WILLIAMS, FELIPE | : | |
| RAMIREZ, and ULIZES SANCEN | : | |
| | : | |
|     Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff Logicalis, Inc. ("Logicalis" or "Plaintiff"), brings this civil action

against Defendants CenterGrid, LLC ("CenterGrid") and certain former employees

Bob Chapp, Sarah Harrison, David Townsend, Rebecca Miracle, Ryan Feld, Nico

Baumgart, Bobby Hamilton, Alisha Johnson, Ron Williams, Felipe Ramirez and

Ulizes Sancen (collectively "Former Employee Defendants") (collectively

CenterGrid and the Former Employee Defendants will be referred to as

"Defendants"), seeking damages, attorneys' fees and injunctive relief for violations

of the Defend Trade Secrets Act 18 U.S.C. § 1836, the Michigan Uniform Trade

Secrets Act § 445.1901 *et seq.*, and Michigan common law. For its Complaint, Logicalis, by and through its undersigned counsel, hereby states and alleges as following:

## NATURE OF THE ACTION

1.  Logicalis brings this action seeking injunctive and monetary relief against CenterGrid and the Former Employee Defendants for the unlawful misappropriation of Logicalis' trade secrets, tortious interference with contracts and/or prospective business advantage, unjust enrichment, breach of fiduciary duties, unfair competition, civil conspiracy, and, as to Defendant Bobby Hamilton ("Hamilton") only, breach of contract.

2.  Logicalis is the United States subsidiary of Logicalis Group, an award-winning, global technology solutions company that provides digital services solutions for its customers, including, among other things, information technology (IT) "managed services," including "help desk" services. Logicalis Group companies operate in various locations around the globe.

3.  IT managed services involve the outsourcing of some or all of a company's IT needs to a third-party provider.  These services can include a wide range of IT functions including on "help desk" services, administration and remote monitoring, and full network and server infrastructure management.  They can also include complete outsourcing of the IT function including all personnel and assets.

4.  Help desk services are the first tier of support provided to a customer's users/employees for all their IT needs including problems with software and hardware.  Help desk services can be available 24/7 and 365 days a year to answer customer support calls and emails.  Help desks can provide support with a variety of applications including operating systems, security applications, internet browsers, office applications such as Adobe, Microsoft Office 365 and Google Docs as well as hardware such as mobile devices, laptops, desktops, printers and peripherals (keyboards, mouse).

5.  Logicalis prides itself on partnering with its customers and being an extension of their IT departments.  It spends a great deal of time and effort in developing a deep understanding of its customers' business needs and IT systems, tailoring its services to deliver a customized and personalized suite of services for every customer, and developing close relationships with its customers' internal IT teams and other employees.

6.  In July 2011, Logicalis acquired an IT solutions provider Netarx, in a multi-million-dollar transaction. Netarx, then based in Auburn Hills, Michigan, provided collaboration, data center, and managed services offerings, including help desk services to customers throughout the Midwest. In this transaction, Logicalis acquired all assets of Netarx, including its intellectual property, including trade secrets, its employees and customer base.

7.  Logicalis acquired Netarx for the express purpose of adding help desk services to its managed services offerings.  At the time of the acquisition, Logicalis executives highlighted the "mature and efficient services desk team" as one of the key valuable assets in the transaction, which filled a long-felt customer need.

8.  Of the approximately two hundred and thirty (230) Netarx employees who joined Logicalis, fourty-nine (49) worked in the help desk area, including Defendant Bob Chapp ("Chapp"), a Netarx senior executive who oversaw the development of Netarx's help desk, and Sarah Harrison ("Harrison"), who was one of Chapp's two long-time "lieutenants." Chapp's other longtime lieutenant was Defendant David Townsend ("Townsend") who joined Chapp and Harrison at Logicalis in 2014 and later moved with him to CenterGrid.

9.  Upon information and belief, since at least March 2021, CenterGrid and the Former Employee Defendants have and continue to willfully misappropriate Logicalis' confidential trade secrets relating to Logicalis' help desk services. These trade secrets fall into three principal areas:

> a.  help desk operations information including business strategies relating to help desk employee retention, training and supervision, efficient structure and operations of a help desk to ensure superior 24/7 customer service, budget and financial plans, marketing plans and opportunities for growth, and other confidential information that

4

would not otherwise readily be available to a third-party competitor ("Operations Information");

b. employee information and relationships, including information regarding which Logicalis help desk employees are the most experienced, highly trained and/or capable of servicing multiple Logicalis help desk customers, how likely those individuals would be willing to leave the employment of Logicalis and, thus, which Logicalis employees are the most vulnerable to poaching, employee private contact information such as cell phone numbers, salaries and benefits and other confidential information that would not otherwise readily be available to a third-party competitor ("Employee Information"); and.

c. customers information and relationships, including information regarding customers' unique preferences and service level requirements, pricing, the identity of customer decision makers, which Logicalis employees were most trained on and knowledgeable about the particular customer's IT system and unique needs, and other confidential information that would not otherwise be readily available to a third-party competitor ("Customer Information").

10.  Logicalis' Operations Information, Employee Information and Customer Information (collectively "Logicalis' Trade Secrets") derive independent economic value from not being generally known to or not being readily ascertainable by proper means by others, including other competitors and potential competitors such as CenterGrid, who can obtain economic value from their disclosure and/or use.

11.  Upon information and belief, Defendants, most especially CenterGrid, Chapp, Harrison and Townsend, acted in concert to purloin a ready-made help desk without investing the time, money, or resources truly necessary to develop either one from scratch or to acquire a fully-functional and operational help desk, complete with infrastructure, employees and customers, like Logicalis did with Netarx.

12.  As a result, upon information and belief CenterGrid, with the help of Chapp, Harrison, and Townsend, was able to set up and launch a help desk service offering in a small fraction of the time, cost and other resources that otherwise would be required were it starting from scratch, enabling CenterGrid to enter the market, quickly secure critical, experienced employees, and begin to market to customers within just a few weeks of Chapp, Harrison and Townsend joining CenterGrid.

13.  Upon information and belief, by no later than May, 2021, CenterGrid, Chapp, Harrison and Townsend had developed the business, recruitment, and

marketing plans necessary to launch a service desk offering at CenterGrid, including marketing materials on the CenterGrid website, and had hired at least two (2) service desk employees from Logicalis to service any business that they obtained.

14.  Starting this fall, upon information and belief, Defendants have used Logicalis' trade secrets to successfully poach at least six (6) additional Logicalis employees and attempted to poach at least one (1) other, including, first, two (2) help desk supervisors and, then, four (4) service desk workers.  Upon information and belief, Defendants are also using Logicalis' misappropriated trade secrets to solicit and secure the business of a number of Logicalis' help desk customers, including, at least Simon Properties, Spectrum Brands, and several others.

15.  Initially, when Chapp, Harrison, and Townsend went to CenterGrid, Logicalis was not particularly concerned as several years ago CenterGrid had hired a small group of five (5) of Logicalis' Managed Services employees and engaged in appropriate competition for both talent and business thereafter.

16.  In fact, Logicalis has elected generally not to use non-compete agreements because it respects employees' right to job mobility and fair competition.  Indeed, in its offer letters, Logicalis expressly warns new employees that they are not to use any trade secret or confidential information of their former employers and it

expects that its competitors will require the same of any Logicalis employees that they hire.

17. This fall, however, once CenterGrid and the other Defendants began to poach Logicalis employees on a regular basis and also began targeting Logicalis customers, it has become apparent that CenterGrid and the other Defendants are *not* engaging in fair competition and are instead unfairly trying to poach Logicalis employees and steal its customers, relying upon misappropriated Logicalis' Trade Secrets to do so.

18. Logicalis is thus justifiably concerned that, without the Court's intervention, this poaching and other unfair competition and trade secret misappropriation will continue unabated for the foreseeable future and Logicalis will continue to be harmed.

## THE PARTIES

19. Logicalis is a New York corporation with a place of business is located at 2600 Telegraph Road, Suite 200, Bloomfield Hills, MI 48302.

20. Upon information and belief, CenterGrid is a limited liability company organized under the laws of Ohio, having its principal place of business located at 101 Knightsbridge Drive, Hamilton OH 45011. On information and belief, as stated on its website, CenterGrid operates a service desk center in Detroit, MI.

(Attached hereto as **Exhibit A** is a true and correct copy of CenterGrid's website page for its help desk services, last accessed on December 10, 2021.)

21.  Chapp was the Senior Director of Service Desk of End User Support at Logicalis and is last known to reside at 33816 Pineview Lane, Fraser MI.  Chapp's official start date at Logicalis was July 1, 2011.  His final day of employment at Logicalis was April 1, 2021; however, his last day actually working at Logicalis was February 26, 2021.

22.  Upon information and belief, Chapp is now employed by CenterGrid as Vice President of Service Desk. Further upon information and belief, Chapp commenced his employment with CenterGrid on or about March 22, 2021.

23.  Harrison was the Director of Service Delivery of the Service Desk at Logicalis and is last known to reside at 3506 Victoria Station, Davison MI. Harrison's official start date at Logicalis was July 1, 2011, and her final date of employment at Logicalis was April 2, 2021.

24.  Upon information and belief, Harrison is now employed by CenterGrid in its service desk operations, commencing in or about April 2021.

25.  Townsend was the Senior Operations Manager of the Service Desk at Logicalis and is last known to reside at 7225 Sherwood Lane, Davison MI. Townsend joined Logicalis on April 8, 2014, and his final day of employment there was March 3, 2021.

26.  Upon information and belief, Townsend is now employed by CenterGrid in its service desk operations, commencing in or about March 2021.

27.  Defendant Rebecca Miracle ("Miracle") was the Transitions, Project and Reporting Manager at Logicalis and is last known to reside at 5305 Kingsfield Drive, West Bloomfield Township MI.  Miracle joined Logicalis on November 7, 2011, and her final day of employment there was August 30, 2021.

28.  Upon information and belief, Miracle is now employed by CenterGrid in its service desk operations, commencing in or about September 2021.

29.  Defendant Ryan Feld ("Feld") was a Service Desk Technician at Logicalis and is last known to reside at 30262 Roan, Warren MI. Feld joined Logicalis on June 22, 2015, and his final day of employment there was May 21, 2021.

30.  Upon information and belief, Feld is now employed by CenterGrid in its service desk operations, commencing in or about May 2021.

31.  Defendant Nico Baumgart ("Baumgart") was a Service Desk Technician at Logicalis and is last known to reside at 1350 Shenandoah Drive, Clawson MI. Baumgart joined Logicalis on February 5, 2018, and his final day of employment there was May 17, 2021.

32.  Upon information and belief, Baumgart is now employed by CenterGrid in its service desk operations, commencing in or about May 2021.

33.  Hamilton was a Supervisor of the Service Desk at Logicalis and is last known to reside at 18582 Meier Street, Roseville MI.  Hamilton joined Logicalis on July 18, 2016, and his final day of employment there was September 3, 2021.

34.  Upon information and belief, Hamilton is now employed by CenterGrid in its service desk operations, commencing in or about September 2021.

35.  Defendant Alisha Johnson ("Johnson") was a Service Desk Technician and is last known to reside at 90 Cherokee Road, Pontiac MI. Johnson joined Logicalis on July 30, 2018, and her final day of employment there was October 25, 2021.

36.  Upon information and belief, Johnson is now employed by CenterGrid in its service desk operations.

37.  Defendant Ron Williams ("Williams") was a Service Desk Technician at Logicalis and is last known to reside at 5096 Spinning Wheel Dr., Grand Blanc MI. Williams joined Logicalis on April 16, 2018, and his final day of employment there was November 12, 2021.

38.  Upon information and belief, Williams is now employed by CenterGrid in its service desk operations, commencing in or about November 2021.

39.  Defendant Felipe Ramirez ("Ramirez") was a Service Desk Technician at Logicalis and is last known to reside at 26334 McDonald Street, Dearborn Heights MI.  Ramirez joined Logicalis on February 25, 2013, and his final day of employment there was October 10, 2021.

40.  Upon information and belief, Ramirez is now employed by CenterGrid in its service desk operations, commencing in or about October 2021.

41.  Defendant Ulizes Sancen ("Sancen") was Service Desk Technician at Logicalis and is last known to reside at 1821 Michigan Blvd., Lincoln Park MI. Sancen joined Logicalis on March 22, 2017, and his final day of employment there was October 29, 2021.

42.  Upon information and belief, Sancen is now employed by CenterGrid in its service desk operations.

## JURISDICTION AND VENUE

43.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1131 and 1338(a) as this action arises under, *inter alia*, the Defend Trade Secrets Act 18 U.S.C. § 1836. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, as the state claims arise from the same common nucleus of operative fact as the federal claims.

44.  This Court has personal jurisdiction over CenterGrid during the relevant period, because, upon information and belief, CenterGrid maintains a service desk operation in Detroit, MI, and therefore resides in this District. Further, CenterGrid has maintained continuous, systematic and purposeful contacts with this District, the acts complained of in this Complaint were committed by Defendant CenterGrid

against Logicalis in Michigan, and/or CenterGrid's actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

45. This Court has personal jurisdiction over Chapp as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

46. This Court has personal jurisdiction over Harrison as she resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by her against Logicalis in Michigan, and/or her actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

47. This Court has personal jurisdiction over Townsend as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

48. This Court has personal jurisdiction over Rebecca Miracle as she resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by her against Logicalis in Michigan, and/or her actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

49. This Court has personal jurisdiction over Feld as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were

committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

50.  This Court has personal jurisdiction over Baumgart as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

51.  This Court has personal jurisdiction over Hamilton as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

52.  This Court has personal jurisdiction over Johnson as she resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by her against Logicalis in Michigan, and/or her actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

53.  This Court has personal jurisdiction over Williams as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

54.  This Court has personal jurisdiction over Ramirez as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were

committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

55.  This Court has personal jurisdiction over Sancen as he resides and worked for Logicalis in Michigan and the acts complained of in this Complaint were committed by him against Logicalis in Michigan, and/or his actions resulted in irreparable and ongoing injuries suffered by Logicalis in Michigan.

56.  Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b) as to all Defendants in that Defendants are residents of the District and/or are otherwise subject to personal jurisdiction in this District and because a substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL BACKGROUND

## LOGICALIS ACQUIRES US HELP DESK
## SERVICE LINE THROUGH NETARX ACQUISITION

57.  In 2011, Logicalis added help desk services in the United States, with help desk staff in located in Bloomfield Hills, Michigan and, later, in Tempe, Arizona. Sister companies in Logicalis Group also offer help desk services across the globe, including in South Africa through Logicalis South Africa ("LSA").

58.  Logicalis' purchase of Netarx in 2011, included all of its assets, including but not limited to all of its managed service and help desk business lines, as well as

a full assignment of Netarx's intellectual property, including its confidential trade secrets.

59. Chapp, Harrison and other mid-level service desk leadership personnel and service desk technicians joined Logicalis from Netarx in July 2011 after the acquisition closed.  Chapp and Harrison were then integrated into Logicalis' leadership structure.

60.  Chapp, who joined Netarx in 1998, and Harrison, who joined Netarx in 2007, led the development, design, and operation of the help desk function at Netarx and then its transition to Logicalis.

61.  After being acquired by Logicalis, the help desk operations (referred to as the "Service Desk" at Logicalis) were further developed and enhanced over the last ten (10) years under supervision of Chapp, Harrison and Townsend (who joined in 2014).

62. When first acquired by Logicalis in 2011, the Service Desk operations employed approximately 49 employees and operated out of one location in Michigan.  By the beginning of 2021, it had grown to approximately 145 employees across two locations – Bloomfield Hills, Michigan and Tempe, Arizona, which was added in 2016.

63. Under the oversight of Chapp, Harrison, and Townsend, the Service Desk was highly successful and profitable.  Although it is customary for there to be high

turnover among help desk employees due to the nature of the position, by the time Chapp, Harrison and Townsend left in the Spring of 2021, the Service Desk had many employees with longer tenures.  Upon information and belief, Chapp credited much of the success of the Service Desk to the relationships that he and his team built with and among the employees and with the Service Desk customers.

64.  By the beginning of 2021, Logicalis also had over sixty-five (65) customers using its help desk services.  The help desk service regularly received positive reviews from customers and was a valuable asset in the Logicalis portfolio.

## LOGICALIS SERVICE DESK OPERATIONS

### *Customer Relationships and Contracts*

65.  Before a customer contracts with Logicalis for any managed services, including Service Desk, typically Logicalis enters into a Non-Disclosure Agreement ("NDA") with the customer to allow for the mutual sharing of confidential information, including about the customer's IT needs and the services that Logicalis can perform.  Although customers will provide some high-level confidential information about their systems and requirements once an NDA is entered into, customers generally do not provide access to or offer extensive details about their systems and operations until after retaining Logicalis to provide services.

66.  Thereafter to contract for services, Logicalis managed services customers, including for Service Desk services, typically enter into a "Master Solutions Agreement" or "MSA" with Logicalis that sets out the terms and conditions of the relationship.

67.  Logicalis' standard MSA includes a mutual confidentiality provision protecting each party's confidential business information such as data relating to pricing, methods, processes, strategic plans, customer and supplier information and the like.  The confidentiality provision also permits Logicalis to share the customer's information with employees only (1) on a "need to know" basis and (2) who are subject to legally binding confidentiality obligations, and vice versa.  The MSAs themselves are confidential and marked as such.

68.  Logicalis also negotiates with the customer a "Scope of Work" or "SOW" for each service provided by Logicalis, which is governed by the terms and conditions of the MSA.  Under the SOW for Service Desk services, Logicalis and the customer agree on certain "service levels," which are generally referred to within Logicalis as the Service Level Agreement or SLA. Among other things, the parameters and conditions of the services Logicalis provides to the customer are set forth in the SLAs, including things like how quickly calls must be answered, the time it must take to resolve a matter, the point at which a matter should be escalated and to whom if it cannot be resolved and the like.

69. The Logicalis' team's performance of the SLAs is tracked and the depending on the terms of the MSA and SOW a customer may be provided with reports on a periodic basis on various metrics.  Customers can contract for unique reporting requirements.  There are also periodic (*e.g.,* quarterly) meetings in which the performance is reviewed and discussed.  Since it takes considerable time for Logicalis and its team to learn a customer's system and requirements, the SLAs can include ramp up time for Logicalis personnel to achieve the desired service levels and the opportunity for agreement adjustments as Logicalis learns the customers' particular business, organization, systems and service needs.

70.  Service Desk pricing is proprietary and can be fairly complicated, taking into account a number of factors, including the anticipated number of incidents per month, and the level of support provided.  Pricing may also adjust over the time period of the contract and/or may include set up fees.

71.  Service Delivery Managers ("SDMs") oversee the implementation of the requirements in the SLAs, acting as the main liaison between Logicalis and the client, while Service Desk Technicians ("SDTs") provide help desk services for clients depending on their respective skill sets and their training and experience with the particular client.

72.  In terms of process, when clients call or email the Service Desk with a technological problem, it is documented in a "Ticket." Tickets are then assigned to

SDTs who are tasked with remedying that request (sometimes the individual initially receiving the request and other times another Service Desk member).

73.  If there are matters that the SDTs cannot resolve and/or depending on the specific customer's SLA requirements, Tickets are escalated either to other parts of the Logicalis "Managed Services" team, to other IT personnel within the particular client or even to other IT personnel at another out-sourced provider the client has hired to provide more complex IT services.

74.  More specifically, Logicalis Service Desk is a technology service solution that is part of a suite of IT services provided by Logicalis' Managed Services team. The Service Desk is considered "Tier - 1" services. Managed Services, which include Tiers 2-4 at Logicalis, are a next-level suite of services that address a customer's service needs through three tiers of progressively advanced technical assistance, culminating in engineers and architects who are certified in troubleshooting a client's specific machine hardware and software.

75.  Clients who use the higher tiers of Logicalis Managed Services may also use the Logicalis Service Desk.  Alternatively, certain Logicalis clients only use the Logicalis Service Desk and not the remainder Logicalis' Managed Services. Instead, those clients rely upon internal or other external resources to address escalated problems.

76.  In order to perform their jobs effectively and to ensure the proper handling of confidential customer information, SDMs and SDTs from the Service Desk are typically assigned to and work closely with specific Logicalis clients.  The SDMs and SDTs thus become knowledgeable about the client's confidential information, including  (for both SDMs and SDTs) the specific services and technological support products the client requires, (for both SDMs and SDTs) the details and unique elements of each client's individual IT Infrastructure, as well as (for both SDMs and SDTs) the client's unique IT preferences and needs, and (only for SDMs) the exact pricing and terms offered to the client.

77.  Indeed, every SDT is trained extensively on each client's system and unique requirements when first assigned to that account.  Some customers provide scripts that the SDTs must follow in responding to calls and requests.

78.  Only those SDTs with extensive experience generally and as to specific clients will be brought in to handle more complex Tickets, thereby ensuring the best quality service delivery including resolution of the matter with speed and efficiency. Furthermore, if unhappy with the performance of an SDT, a customer can request that the SDT be removed from their account.

79.  Not every Service Desk employee is trained on every customer's system. Indeed, prior to the Spring of 2021, many SDTs were only assigned to one account and trained on that account.  Even today, most SDTs are trained on only a small

number of customers systems in order to assure maximum support of that client's needs.  A few of the most experienced and skilled SDTs work on many different customer accounts.

80.  This focused confidential knowledge and expertise allows Logicalis to provide valuable, unique and superior service to each client, and provides Logicalis a competitive advantage over third-party help desk providers that are not already experienced in working with the particular client.

### ***Reasonable Measures to Maintain Confidentiality of Logicalis Trade Secrets***

81. As an IT company, especially one that has daily access to its customers' computer networks and confidential, proprietary and trade secret information, Logicalis takes confidentiality and information security with the utmost seriousness.  Logicalis also demands that every employee similarly take the duty of preserving confidentiality seriously, instructing its personnel, as at least one of its policies states, that "Security is everyone's responsibility."

82.  Logicalis relies upon numerous measures to preserve the confidentiality and security of its information and that of its customers and suppliers, especially the most sensitive information such as trade secrets.  In addition to things like customer agreements requiring confidentiality, Logicalis has a general policy of limiting access to information on a need-to-know basis, labeling documents as

confidential where appropriate, and numerous other detailed procedures and requirements related to information security and confidentiality.

83.  In particular, Logicalis' policies including those for (1) acceptable use of equipment; (2) access controls; (3) cryptology and encryption; (4) data retention, archiving and disposal; (5) email retention; (6) hard copy and electronic media handling; (7) general information security; (8) internal and external communications; (9) mobile device support; and (10) passwords, as well as a Confidentiality Policy, Code of Conduct, Conduct and Working Environment Policy, Secured Area, Clean Desk and Clear Screen Policy, and a Social Media Usage Policy. [1]These policies set forth the expectations on and obligations of employees to maintain as confidential Logicalis business information and trade secrets as well as the confidential information of its customers, suppliers, vendors and employees and to not use such information for improper purposes, including any purpose other than Logicalis' business.  These policies provide for a myriad of protection measures including, for example, classification of information and protection levels depending on that classification, access controls to ensure that only personnel who need to know relevant information have access to it, extensive requirements for password protection on software and hardware, requirements for encryption and cryptography of data depending on the type and sensitivity level,

---

[1] Copies of these policies will be provided upon entry of a protective order.

guidelines for secure destruction of confidential and sensitive information,

guidelines for remote access to Logicalis' systems, and physical security protocols

including requiring documents and equipment to be secured, privacy screens to be

used on monitors, auto locks on mobile devices, and locking of desks and offices

as appropriate. The types of information that is particularly called out as needing

protection includes customer information, employee information and commercial

plans and records, among others.  Trade secrets and other proprietary information

are expressly also highlighted.

84.  Upon hire and then annually, each employee is required to attend trainings

on these many of these policies, during which they are tested upon what they have

read, and must attest on line that they have read the policies and Code of Conduct.

85.  When employees leave Logicalis, they are informed, typically in writing, of

their continuing duties to maintain in confidence Logicalis' confidential,

proprietary and trade secret information as well as that of its customers and other

business partners. In particular they are reminded that any work product or other

information they have come in contact with or developed at Logicalis belongs to

Logicalis and cannot be used for any other purpose upon departure.

### *High Value Service Desk Employees*

86.  Many regular Service Desk employees are entry-level workers and are

compensated on an hourly basis.  The position, which is a 24/7/365 operation,

offers flexibility to workers interested in working outside of regular business hours, such as students or those with other full-time jobs.  In short, for many SDTs the position is not a career path, leading to generally high turn-over.

87.  Thus, SDTs with long tenures and extensive skills and experience are highly valued.  At Logicalis, some SDTs – sometimes referred to as "Desk-Top" workers – have experience and training with many different customers, which make them especially versatile and able to work on many different accounts.  A Service Desk worker who combines extensive technical skills and experience on the one hand, and knowledge and experience with many different customers on the other, especially one with long tenure at Logicalis, is an asset with a high competitive value.

### *Logicalis Seeks to Offshore* *Some of its Service Desk Operations*

88.  In 2020, Logicalis sought to make its Service Desk operations more affordable for customers, as well as more profitable for Logicalis, by offshoring a substantial portion of its US operations.  Accordingly, it sub-contracted with Logicalis South Africa Pty ("LSA"), a sister company in the Logicalis Group to move a significant segment of its US Service Desk operations to South Africa. In particular, the plan was that the Service Desk services provided to most of the clients would move to LSA and be handled by LSA personnel, with the transition occurring in five (5) waves between December 2020 and February 2021.  About

three-quarters of the US Service Desk SDT positions were to be eliminated once the transition was complete, with only a dramatically reduced team (from around 140-160 employees to 35-40 employees) remaining in the US.

89. In October 2020, Logicalis offered Chapp, Harrison and Townsend and other key Service Desk Personnel (several of whom are also Defendants in this case) stay bonuses to ensure that the Service Desk leadership would remain in place through the transition to LSA.

      a. In particular, Chapp would receive a stay bonus of provided he remain employed with Logicalis until August 15, 2021 and 90% of the Service Desk transition was completed by that date (bonus to be paid on August 31, 2021).

      b. Harrison, Townsend, Miracle, Hamilton and Williams were also to receive stay bonuses, provided they each remain employed with Logicalis until February 28, 2021 (bonus to be paid on March 15, 2021).

90. In Spring of 2021, Logicalis reversed its decision to move the majority of its US Service Desk operations to LSA and over the ensuing months brought transferred accounts back to the US. It became clear to Logicalis management while the transition was underway that the LSA staff could not provide the same level of service offered by the US team. In addition to management's own

concerns, a number of clients expressed strong dissatisfaction with the offshoring and with the quality of the services provided by the LSA staff.

91.  Thus, since Logicalis reversed course, no Logicalis US employees were terminated because of the offshoring decision; however, the US Service Desk personnel were aware of the decision to offshore the bulk of the operations and some began to seek employment elsewhere.

### CHAPP, HARRISON AND TOWNSEND HATCH AND IMPLEMENT PLAN TO STEAL SERVICE DESK FROM LOGICALIS AND RECREATE IT AT CENTERGRID

92.  On December 16, 2020, dissatisfied with the plan to move a significant portion of Logicalis' US Service Desk operations to LSA, Chapp (on behalf of himself, Harrison and Townsend) sent an email to Jeremy Blanton ("Blanton"), Logicalis' then Vice-President of Services and Chapp's direct superior, requesting that he and his lieutenants be put in charge of all Logicalis Service Desk Operations around the Globe.  Specifically, Chapp suggested that he be named Vice President of Global Service Desk, Harrison be named Director of Global Service Desk Operations, and Townsend be named Senior Director of Global Service Desk Delivery, after the complete transition of operations to LSA. Logicalis declined to do so.

93.  On January 18, 2021, Chapp emailed Blanton requesting that his stay bonus deadline be changed and paid out on March 15, 2021 instead of in August 2021. Logicalis did not agree to this change.

94.  Upon information and belief, no later than in February 2021, Chapp, Harrison and Townsend having been rebuffed in their bid to take over the global Logicalis Service Desk operations, entered into discussions with CenterGrid to launch a help desk operation for that company.

95.  Upon information and belief, Chapp, Harrison, Townsend and CenterGrid conspired to circumvent the normal process of building a new help desk by recreating the Service Desk in place at Logicalis, including using, among other things, the same valuable and confidential business and marketing strategies developed at Logicalis.  Upon information and belief, the purpose of this plan was both to unfairly enrich CenterGrid (and thus themselves) at the expense of Logicalis, and, specifically, to harm Logicalis in the employee and customer marketplace as retribution for not promoting them and for terminating Chapp.

96.  In addition, upon information and belief, in furtherance of their conspiracy, Chapp, Harrison, Townsend and CenterGrid planned to solicit and recruit key Logicalis Service Desk personnel to the desk, including managers Miracle and Hamilton and the most seasoned and versatile SDTs, such as Ryan Feld, Nico

Baumgart, Alisha Johnson, Ron Williams, Felipe Ramirez and Ulizes Sancen, offering them the same or better pay than they were receiving at Logicalis.

97.  Finally, upon information and belief, with the Service Desk infrastructure and core team in place and recruiting planned, Chapp, Harrison, Townsend and CenterGrid, with the assistance of the other Former Employee Defendants, also in furtherance of their conspiracy, planned to solicit and lure Logicalis Service Desk customers to CenterGrid, promising them the same SDTs and leadership that worked on their accounts at Logicalis and thus the same quality and level of service that they were used to at Logicalis, at competitive or better pricing.

98.  Upon further information and belief, by February 2021, CenterGrid, Chapp, Harrison and Townsend planned to launch the new CenterGrid Service Desk operations in or about March 2021 with Chapp at the helm, with a plan to go to market by no later than May 2021.

99. Upon information and belief, in furtherance of the plan to steal the Service Desk, rather than alleviating Logicalis' customers and US Service Desk staff concerns about the transition or taking action to improve the situation, Chapp, Harrison and Townsend publicly echoed these concerns.

100.    On Monday, February 22, 2021, based on his actions to date, Logicalis terminated Chapp after it became concerned that Chapp would not effectively support Logicalis' leadership decision to relocate the majority of the US

Service Desk operations to LSA.  Although he was compensated by Logicalis through April 1, 2021, Chapp's last day of work at Logicalis was Friday, February 26, 2021.  His departure was also announced to the Logicalis Service Desk personnel via email on Wednesday, February 24, 2021.

101.     Immediately following Chapp's termination, Townsend submitted his resignation on March 3, 2021, leaving without even providing the customary two weeks' notice.  Prior to his departure, Townsend deleted his entire email box, directly in violation of Logicalis' IT policies.  Upon information and belief, at least one purpose of this deletion was to harm Logicalis and make its continued operations more difficult after his departure.

102.     On March 4, 2021, Logicalis agreed to pay Harrison an additional stay bonus as an incentive to remain with Logicalis.  That stay bonus was to be paid on March 15, 2021, the same day as the original stay bonus was paid.  Upon information and belief, Harrison accepted this second stay bonus in bad faith, as she had already been recruited by CenterGrid and made the decision to leave Logicalis.

103.     On March 15, 2021, despite having received the second stay bonus, Harrison nonetheless resigned her position with Logicalis, formally ending her employment on two (2) weeks' notice on April 2, 2021.

104.     On information and belief, Chapp and Townsend began working at CenterGrid in March 2021 and Harrison in early April 2021.

105.     Upon further information and belief, the speed with which Chapp, Townsend and Harrison were able to land in new, identical positions at CenterGrid – which previously provided *no* help desk services – and to launch a new business line including recruiting additional personnel from Logicalis, suggests that they had been working with CenterGrid to effectuate their moves for some time prior to their departure from Logicalis, but in any event at least as early as February 2021.

106.     Upon information and belief, in furtherance of their plan to jump-start the launch of the CenterGrid Service Desk, beginning sometime in March or April 2021, CenterGrid, Chapp, Harrison, and Townsend began efforts to poach numerous additional Logicalis Service employees, relying upon Logicalis' trade secret and confidential information about Logicalis clients and employees in order to decide which employees to try to poach and what compensation and benefits to offer.

107.     In particular, upon information and belief, CenterGrid, Chapp, Harrison, and Townsend used Logicalis' trade secret knowledge and information including but not limited to (1) which Service Desk employees (SDMs and SDTs) were top performers and thus more valuable and versatile employees; (2) which employees worked on which customer accounts, which would enable CenterGrid

to, among other things, target those specific accounts and offer experienced personnel who could hit the ground running on the accounts; (3) who was likely to entertain a competing offer because of dissatisfaction with Logicalis or other reasons; and (4) other information such as employees' salary, benefits and non-public contact information such as personal cell phone numbers, which enabled them to target and successfully recruit the Logicalis personnel in an otherwise very competitive job market.

108.     Upon information and belief, in order to collect additional trade secret, confidential and proprietary information about the Service Desk employees to better determine which ones were best for and ripe for "poaching", Harrison organized a "Head Count Discussion / Risks" Meeting (also known as the "Critical Agent Meeting") of Service Desk management personnel that was conducted on March 23, 2021, just one week before her departure and after she had already given notice to Logicalis. Attendees were told that the purpose of the meeting was to determine which SDTs were most valuable to the company *and* most at risk of leaving, ostensibly so that management would know which employees to make efforts to keep (such as through raises).

109.     At the time of this meeting, Harrison reported to Scott Little, Director, Service Desk Operations.  Harrison did not inform Little or anyone else in Logicalis management that this meeting was occurring.  In fact, Little and

Logicalis management did not learn about the meeting until after it had occurred and no knowledge gleaned from the meeting was shared with Little or Logicalis.

110.     Upon information and belief, this stated meeting reason was pure pretext; the only purpose of the meeting was for Harrison to harvest, for use at CenterGrid, Logicalis trade secret, confidential and proprietary information about which service desk employees were critical assets for which customer accounts and, further, were also at risk of leaving the company.  During the meeting a list of customers was prepared and specific "at risk" service desk employees were identified as critical to each customer account.

111.     In addition to Harrison, Defendants Miracle and Hamilton attended the Critical Agent Meeting.

112.     On information and belief, Defendants used Logicalis confidential, proprietary, and trade secret information, including that learned at the meeting, to poach the uniquely talented and uniquely vulnerable employees from Logicalis. Notably, at least Defendants Feld, Baumgart, Sancen, and Ramirez, were identified at the meeting as being on the Critical Agent list.  In addition, upon information and belief, Defendants also targeted at least one other employee on the Critical Agent list, but to date that employee has chosen to remain at Logicalis.

113.     Since the Former Employee Defendants began work at CenterGrid, CenterGrid has been able to lure away at least two Service Desk customers, Simon

and Spectrum Brands.  Upon information and belief, Defendants used Logicalis'

confidential, proprietary and trade secret information to target, market to and

ultimately secure these customers, including but not limited to SLAs, pricing,

whether or not the customer was happy with the shift to LSA, which SDMs and

SDTs worked on the account and the like.  In addition, CenterGrid employed

several experienced SDMs and SDTs that were experienced with and able to work

on the Simon and Spectrum Brands accounts, thus avoiding a significant learning

curve, which Defendants were able to leverage in securing the customer.  Thus,

CenterGrid obtained an undue commercial advantage and was able to secure these

accounts where a third-party competitor without access Logicalis' confidential,

proprietary and trade secret information would have likely failed.

114.    Upon information and belief, Defendants have targeted and are

continuing to target other Logicalis Service Desk customers, relying upon

Logicalis' confidential, proprietary and trade secret information to do so, again

providing it with an undue commercial advantage as compared to a third-party

competitor without access to such information.

## COUNT I
### Federal Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act 18 U.S.C. § 1836
### *Against All Defendants*

115.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 114, as if fully set forth herein.

116.     Logicalis confidential and proprietary information and trade secrets, including the Logicalis Trade Secrets, have independent economic value and are not generally known or readily ascertainable by persons other than those employed by Logicalis.

117.     As a result of the Former Employee Defendants employment with Logicalis, the Former Employee Defendants used, received, had, and continue to use, receive, and have knowledge of Logicalis' confidential, proprietary and trade secret information, including the Logicalis Trade Secrets.

118.     Upon information and belief, as a result of CenterGrid inducing the Former Employee Defendants to leave Logicalis and/or hiring them upon their departure, as well as inducing and/or allowing the Former Employee Defendants to disclose and use Plaintiff's confidential, proprietary and trade secret information, including the Logicalis Trade Secrets, in the course of their employment at CenterGrid, CenterGrid has gained access to, used, and continues to use Logicalis

confidential, proprietary and trade secret information, including the Logicalis Trade Secrets, to Defendants' undue competitive advantage.

119.     Upon information and belief, at least Chapp, Townsend and Harrison have specifically used Logicalis' confidential, proprietary, and trade secret information, including the Logicalis Trade Secrets, while acting as agents of CenterGrid, to identify, target, and poach Logicalis' employees and customers resulting in damages to be proven at trial.

120.     Upon information and belief, the other Former Employee Defendants are conspiring with and assisting CenterGrid, Chapp, Townsend and Harrison in these efforts.

121.     Logicalis has made, and continues to make, reasonable efforts to maintain the secrecy of its confidential and proprietary information, and trade secrets, including the Logicalis Trade Secrets, including by utilizing confidentiality agreements with customers, employee confidentiality policies, limiting access to customer and employee information on a need to know basis, passwords, encryption, labeling of confidential documents and numerous other confidentiality measures, to protect such information.

122.     Upon information and belief, CenterGrid and the Former Employee Defendants have, and continue to make use of, Logicalis' confidential, proprietary

and trade secret information, including the Logicalis Trade Secrets, without express or implied consent, for their own benefit and for the benefit of Defendants.

123.     The extent and nature of Defendants' activities, as described above, including poaching both current employees and clients of Logicalis, demonstrate the willful and deliberate nature of these actions, and therefore constitute exceptional circumstances.

124.     As a direct and proximate result of the misappropriation of confidential and proprietary information and trade secrets, including the Logicalis Trade Secrets, by all Defendants, Logicalis has suffered, continues to suffer, and will suffer in the future extensive irreparable harm, injury, loss of goodwill, and other injury and damages including reputational damage, loss of market share, loss of key employees, and loss of clients, and as to which there exists no adequate remedy at law. Logicalis will continue to suffer this harm unless and until all Defendants are enjoined from their unlawful behavior.

125.     As a direct and proximate result of all Defendant's misappropriation of trade secrets and confidential and proprietary information, including the Logicalis Trade Secrets, Logicalis has suffered, continues to suffer and will suffer in the future additional damages, which will continue to accrue, including, but not limited to the attorneys' fees and costs related to this litigation and loss of business in an amount to be proved at trial.

126.     Considering the willful, deliberate, and conscious nature of the Defendant's actions in clear disregard for Logicalis' rights, Logicalis is entitled to recover exemplary damages in an amount to be determined at trial.

127.     CenterGrid is at least vicariously liable for the violations of the Defend Trade Secrets Act made by its agents Defendants Chapp, Townsend, and Harrison, and the other Former Employee Defendants in so far as, upon information and belief, they are engaging in such activity, if not directly responsible for orchestrating these violations.

128.     According, all Defendants have violated the Defend Trade Secrets Act 18 U.S.C. § 1836 by misappropriating Logicalis' confidential, proprietary and trade secret information, including the Logicalis Trade Secrets, and are entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, disgorgement of Defendants' profits, attorneys' fees, and injunctive relief.

## COUNT II
### Misappropriation of Trade Secrets
### Under Michigan's Uniform Trade Secrets Act § 445.1901 *et seq.*
### *Against All Defendants*

129.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 128, as if fully set forth herein.

130.     Logicalis' confidential and proprietary information and trade secrets, including the Logicalis Trade Secrets, have independent economic value derived

from their status as confidential and are not generally known or readily ascertainable by persons other than those employed by Logicalis.

131.    Logicalis has made and continues to make reasonable efforts to maintain the secrecy of its confidential and proprietary information and trade secrets, including the Logicalis Trade Secrets.

132.    Chapp, Townsend, and Harrison have received, used and continue to receive and use Logicalis' confidential, proprietary, and trade secret information, including the Logicalis Trade Secrets, in poaching Logicalis employees and customers.

133.    Upon information and belief, Defendants' use of Logicalis' confidential and proprietary information, and trade secrets, including the Logicalis Trade Secrets, have unjustly enriched CenterGrid and the Former Employee Defendants by both accelerating their development of Service Desk operations and developing these services to the sophistication necessary for Defendants to poach Logicalis' clients.

134.    Upon information and belief, Defendant CenterGrid is a least vicariously liable for the misappropriation of Logicalis' confidential and proprietary information and trade secrets, including the Logicalis Trade Secrets, performed by its agents Chapp, Townsend and Harrison while in the ordinary course of their duties, if not directly responsible for orchestrating these violations.

135.     As a direct and proximate result of all Defendant's misappropriation of trade secrets and confidential and proprietary information, , including the Logicalis Trade Secrets, Logicalis has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue, including but not limited to its attorneys' fees and costs related to this litigation, and loss of business in an amount to be proved at trial.

136.     Considering the willful, deliberate, and conscious nature of the Defendant's actions in clear disregard for Logicalis' rights, Logicalis is entitled to recover exemplary damages in an amount to be determined at trial.

137.     Therefore, Defendants, by using, receiving, and continue to use and receive Logicalis' confidential, proprietary and trade secret information, including the Logicalis Trade Secrets, are violating Michigan's Uniform Trade Secrets Act § 445.1901 *et seq.* and must be enjoined from such actions. Logicalis is entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, disgorgement of Defendants' profits, attorneys' fees, and injunctive relief.

**COUNT III**
**Breach of Contract**
**Under Michigan Law**
*Against Bobby Hamilton Individually*

138.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 137, as if fully set forth herein.

139.     Defendant Bobby Hamilton ("Hamilton"), on July 6, 2016, signed a written "Non-Disclosure, Non-Solicitation, and Proprietary Rights Agreement" with Logicalis ("Hamilton Agreement") attached as **Exhibit B**.[2]

140.     The Hamilton Agreement included, among other obligations, the following duties not to recruit employees away from Logicalis and/or to solicit or even accept business from Logicalis' customers for one year after the end of Hamilton's employment with Logicalis:

> 3.     **Non-Solicitation and Non-Acceptance.** You agree that during the Employment Term and for one (1) year following the date that you cease to be employed by Logicalis for any reason, *you will not (i) recruit or solicit any employee* or sales agent *of Logicalis to discontinue such employment* or engagement; seek to employ or retain any such employee or agent; or cause any business, person, firm or corporation which competes directly or indirectly with Logicalis to seek or solicit the employment or retention of any such employee or agent; (ii) *solicit or encourage any person or any business, firm, corporation or other entity which has a business or commercial relationship with Logicalis to seek to discontinue such relationship or reduce the volume or scope of such relationship*; or ii) *even in the event that you do not initiate contact, you will not accept any business from any business, firm, corporation or other entity which has a business or commercial relationship with Logicalis.*

Exh. B at 4 (emphasis added).

141.     Hamilton resigned his employment with Logicalis effective September 3, 2021. Thus, the post-employment provisions of the Hamilton

---

[2] An unredacted version of the Hamilton Agreement will be provided upon entry of a protective order.

Agreement went into effect beginning in September 2021 and will continue until September 2022.

142.    Upon information and belief, Hamilton is currently employed by CenterGrid, and has directly, or indirectly through other Defendants, solicited and recruited Johnson, Williams, Ramirez and Sancen, urging them to discontinue their employment with Logicalis and be hired by CenterGrid.

143.    Upon information and belief, Hamilton has solicited and/or will continue to solicit Logicalis customers in the future and/or encouraged or will encourage Logicalis customers to end their business relationships and agreements with Logicalis and instead contract for Service Desk services from CenterGrid.

144.    In the alternative, upon information and belief, Hamilton has accepted business from Logicalis customers on behalf of Centergrid, including but not limited to Simon, and will continue to do so in the future.

145.    Upon information and belief, by these actions, Hamilton has breached his obligations under the Hamilton Agreement, specifically by soliciting employees and business from Logicalis, and his unlawful actions must be enjoined to prevent further reputational harm, loss of business, and loss of profit damages to Logicalis.

146.    Upon information and belief, the extent and nature of Hamilton's activities in poaching both current employees and clients of Logicalis demonstrate

the willful and deliberate nature of these actions, and therefore constitute exceptional circumstances.

147.    Hamilton's breach of the Hamilton Agreement is material. Logicalis is thus entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, attorneys' fees, and injunctive relief.

### COUNT IV
**Tortious Interference with Contract**
***Against CenterGrid, Chapp, Harrison, Townsend, Miracle, Feld, Baumgart***

148.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 147, as if fully set forth herein.

149.    Upon information and belief, CenterGrid, through its agents Chapp, Townsend, and Harrison, along with Miracle, Feld and Baumgart, targeted and poached Hamilton to not only leave Logicalis, but to breach the Hamilton Agreement by joining CenterGrid and engaging in activities to solicit and recruit other Logicalis employees and solicit Logicalis clients in clear violation of the terms of the Hamilton Agreement.

150.    Chapp, Townsend, and Harrison were direct supervisors of Hamilton at Logicalis, and upon information and belief knew of the existence of his obligations under the Hamilton Agreement. Upon information and belief, CenterGrid, Miracle, Feld and Baumgart also knew or should have known of Hamilton's obligations under the Hamilton Agreement.

151.     Upon information and belief, CenterGrid, Chapp, Townsend, Harrison, Miracle, Feld and/or Baumgart, in willful disregard of his obligations under the Hamilton Agreement, intentionally sought out Hamilton to join CenterGrid, hired him at CenterGrid, and continue to supervise and/or participate in the active breach of his contractual obligations.

152.     CenterGrid, Chapp, Townsend, Harrison, Miracle, Feld and/or Baumgart continue to be unjustly enriched by Hamilton's contributions as an employee of CenterGrid, where he, upon information and belief, is unlawfully using Logicalis confidential, proprietary and trade secret information, including the Logicalis Trade Secrets, to poach other Logicalis employees and customers.

153.     Upon information and belief, CenterGrid, Chapp, Townsend, Harrison, Miracle, Feld and/or Baumgart actions in hiring Hamilton despite his obligations under the Hamilton Agreement demonstrate the willful and deliberate nature of their actions, and therefore constitute exceptional circumstances.

154.     Logicalis, which has and will continue to be harmed by these actions, is thus entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, attorneys' fees, and injunctive relief, resulting from these unlawful actions.

## COUNT V
### Tortious Interference with Prospective Economic Advantage
### Under Michigan Law
### *Against All Defendants*

155.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 155, as if fully set forth herein.

156.    Logicalis maintains profitable contractual business relationships with its Service Desk clients, including the MSAs and SOWs. The Former Employee Defendants, as senior managers of the Logicalis Service Desk, as well as Service Delivery Managers and Service Desk Technicians with the Service Desk, knew of the existence of these clients, their contractual relationships with Logicalis, and the specifics of their respective agreements.

157.    Upon information and belief, the Former Employee Defendants, independently and as agents of CenterGrid, have targeted for employment Logicalis employees responsible for negotiating, securing and/or performing these business contracts and maintain these business relationships, for the sole purpose of inducing those clients to terminate their MSA's and SOWs with Logicalis, and instead purchase competing services offered by CenterGrid.

158.    Upon information and belief, at least CenterGrid, Chapp, Townsend, and Harrison are working in concert to identify key Logicalis employees to poach specifically because of the unique and confidential relationships that exist between these employees and their respective Logicalis clients, for the purposes of using

45

that information to improperly and unfairly compete and interfere with Logicalis' business relationships with those clients.

159.     The extent and nature of Defendants' activities, as described above, including poaching employees of Logicalis, and upon information and belief, successfully soliciting customers to terminate their relationships with Logicalis, demonstrate the willful and deliberate nature of these actions, and therefore constitute exceptional circumstances.

160.     Upon information and belief, at least two (2) Logicalis clients have terminated their MSAs with Logicalis and have contracted with CenterGrid to provide them with Service Desk services.  Defendants have, are, and continue to be unjustly enriched by their use of Logicalis' confidential, proprietary and trade secret information, including the Logicalis Trade Secrets, to interfere with Logicalis' business relationships in violation of Michigan common law.

161.     Because Logicalis will continue to be irreparably harmed, lose business, and suffer loss of profits from its prospective business relationships, Defendants unlawful actions must be enjoined.

162.     In addition, Logicalis is entitled to any and all damages including, but not limited to, actual damages, loss of profit, loss of business, attorneys' fees, punitive damages, and injunctive relief as a result of these unlawful acts.

## COUNT VI
**Unjust Enrichment**
**Under Michigan Law**
*Against All Defendants*

163.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 162, as if fully set forth herein.

164.     Logicalis paid valuable consideration in 2011 for the acquisition of Netarx's assets, including but not limited to all assets relating to its help desk. Thereafter, Logicalis further grew and developed the help desk services into the Service Desk as it stands today.

165.     Logicalis' Service Desk is a profitable, high quality and valuable service offering that is not easily replicable on accelerated basis, if at all, at least not without the use of Logicalis' Trade Secrets, the assistance of the Former Employee Defendants, and taking unfair advantage of the relationships between Chapp, Harrison and Townsend and the other Former Employee Defendants with the remaining Logicalis Service Desk employees and customers, which relationships were developed by and for Logicalis and at its expense.

166.     Further, Logicalis maintains profitable contractual business relationships with its clients to which the Former Employee Defendants were and are intimately aware. These relationships are highly profitable and exist as a direct result of Logicalis' efforts over years to provide a high-quality Service Desk solution for its clients.

167.     As a direct and proximate result of Defendants' unlawful

misappropriation of Logicalis' confidential, proprietary and trade secret

information, including the Logicalis Trade Secrets, and their knowledge of

Logicalis' contractual relationships with clients, Defendants have, and continue to

be, unjustly enriched by using this information to their unfair business advantage.

168.     Upon information and belief, the Former Employee Defendants are

actively using their knowledge of Logicalis' longstanding relationships with clients

to benefit themselves and by departing Logicalis for CenterGrid, are conferring

those benefits upon CenterGrid. These relationships are valuable, and the

Defendants' actions in leveraging confidential details of these relationships,

including, but limited to, the unique and specific needs of the client, the details of

the client's IT systems and preferences, and Logicalis' pricing, among other things,

unfairly allows CenterGrid and the Former Employee Defendants to compete and

benefit at Logicalis' expense without expending the time, effort and resources

necessary to gather and develop such knowledge and information for themselves.

169.     Upon information and belief, at least two (2) Logicalis clients have

terminated their MSAs and SOWS and have contracted with CenterGrid to provide

them with Service Desk services.  Defendants have, are, and continue to be

unjustly enriched by their use of Logicalis' confidential, proprietary and trade

secret information, including the Logicalis Trade Secrets, to interfere with

Logicalis' business relationships in violation of Michigan common law.

170.    Logicalis is therefore entitled to any and all restitution damages

including, but not limited to, actual damages, loss of profit, loss of business,

disgorgement of Defendants' profits, attorneys' fees, punitive damages, and

injunctive relief as a result of the Defendants unlawful retention of benefits

belonging to Logicalis.

## COUNT VII
### Unfair Competition
### Under Michigan Law
### *Against All Defendants*

171.    Plaintiff repeats and realleges the allegations in paragraphs 1 through

170, as if fully set forth herein.

172.    Defendants' unfair and unlawful actions described above in this

Complaint were committed with the purpose and intent of harming, disrupting, and

interfering with Logicalis' legitimate business interests.

173.    Unless enjoined, Defendants will continue in their unfair competition,

which has caused and continues to cause substantial, immediate, and irreparable

harm to Logicalis.

174.    Logicalis has no adequate remedy at law for Defendants' unfair

competition.

175.     As a direct and proximate result of Defendants' unfair competition, Logicalis has been damaged, and Defendants have gained and benefited and will continue to gain and benefit, in an amount to be proven at trial.

**COUNT VIII**
**Breach of Fiduciary Duties**
**Under Michigan Law**
*Against Chapp, Harrison and Townsend*

176.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 175, as if fully set forth herein.

177.     Chapp, Harrison, and Townsend were placed in a position of trust and confidence and owed Logicalis a corresponding degree of fairness and good faith.

178.     Chapp, Harrison and Townsend, in their positions of employment, therefore had fiduciary duties to Logicalis, including, without limitation, a duty to maintain the confidentiality of Logicalis confidential, proprietary and trade secret information, including Logicalis' Trade Secrets and a duty to refrain from competing with Logicalis or assisting a competitor of Logicalis during their employment at Logicalis.

179.     Upon information and belief, Chapp, Harrison and Townsend have improperly and illegally used, disclosed, transmitted and retained Logicalis Trade Secrets and other confidential, proprietary and trade secret information in breach of their fiduciary duties to Logicalis.

180.     Upon information and belief, Chapp, Harrison and Townsend engaged in activities to further CenterGrid's competing business while they were still employed by Logicalis, in breach of their fiduciary duties to Logicalis.

181.     As a direct and proximate result of Chapp's, Harrison's and Townsend's breaches of their fiduciary duties to Logicalis, the company has been damaged, and Defendants have gained and benefited and will continue to gain and benefit, in an amount to be proven at trial.

**COUNT IX**
**Civil Conspiracy**
**Under Michigan Law**
*Against All Defendants*

182.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 181, as if fully set forth herein.

183.     Defendants conspired or were acting in concert with each other in furtherance of (a) breaching and otherwise interfering with the Hamilton Agreement's restrictive covenant obligations, (b) tortiously interfering with Logicalis' business expectancies with its clients and prospective clients, (c) Chapp's, Harrison's, and Townsend's breaches of their fiduciary duty obligations, (d) unjustly enriching CenterGrid and by consequence the Former Employee Defendants by poaching employees and customers, among other things, (e) engaging in the unfair and unlawful actions described herein with the purpose and intent of harming, disrupting and interfering with Logicalis' legitimate business

interests, and (e) misappropriating and converting Logicalis' Trade Secrets, and other confidential, proprietary and trade secret information.

184.    Upon information and belief, Defendants' intentions were to engage in such illegal activity for the express purpose of unlawfully and unfairly competing with Logicalis.

185.    Unless enjoined, Defendants will continue in their unlawful civil conspiracy, which has caused and continue to cause substantial, immediate, and irreparable harm to Logicalis, including, without limitation, the loss of its customers and employees, confidential and proprietary information, trade secrets, intellectual property, goodwill, and competitive position in the marketplace.

186.    Logicalis has no adequate remedy at law for Defendants' unlawful civil conspiracy.

187.    As a direct and proximate result of Defendants' unlawful civil conspiracy, Logicalis has been damaged, and Defendants have gained and benefited and will continue to gain and benefit, in an amount to be proven at trial.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury of all issues so triable in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

A. Judgment in favor of Logicalis on all claims asserted against Defendants;

B. Preliminary and permanent injunctions enjoining Defendants, and those acting in concert with any of them, as follows:

    1. Enjoining and restraining Hamilton from further breaching the Hamilton Agreement;

    2. Enjoining and restraining Defendants from tortiously interfering with Logicalis' contractual rights under the Hamilton Agreement and business expectancies/customer relationships;

    3. Enjoining and restraining Defendants from using, disclosing, disseminating, revealing, misappropriating, or threatening to misappropriate Logicalis' confidential and proprietary information and trade secrets, including the Logicalis Trade Secrets;

C. An Order requiring Defendants to return to Logicalis all of Logicalis' trade secret, confidential and proprietary information, including Logicalis Trade Secrets, and any other Logicalis property in Defendants' possession or custody or under their control;

D. An Order establishing a constructive trust over all compensation, profits, monies, accruals, increments, and other benefits Defendants obtained through their wrongful conduct and further requiring Defendants to disgorge and pay all such compensation, profits, monies, accruals, increments, and other benefits over to Logicalis;

E. An Order directing that an accounting be conducted of all business and benefits Defendants obtained as a result of their unlawful conduct, and awarding all such business and benefits to Logicalis;

F. An Order awarding Logicalis money damages in an amount to be proven at trial;

G. An Order awarding Logicalis exemplary or punitive damages in an amount to be proven at trial based upon Defendants' unlawful acts;

H. An Order awarding Logicalis its costs and attorneys' fees incurred in bringing this action; and

I. An Order awarding Logicalis such other relief as the Court deems just and proper.

DATED: December 10, 2021        Respectfully,
HONIGMAN LLP

<u>/s/ Deborah J. Swedlow</u>
Deborah J. Swedlow (P67844)
315 E. Eisenhower Parkway, Suite 100
Ann Arbor, MI 48108
(734) 418-4268
(734) 418-4269 (facsimile)
bswedlow@honigman.com

Nicole D. Galli (admission to be sought)
ND GALLI LAW LLC
One Liberty Place
1650 Market Street
Suite 3600, #00250
Philadelphia, PA 19103
Telephone: (215) 525-9580
Facsimile: (215) 525-9585
ndgalli@ndgallilaw.com

*Attorneys for Plaintiff Logicalis, Inc.*